**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>vs.<br><br>DESHAUN ANTHONY BULLOCK,<br>JR.,<br><br>　　　　Defendant. | Case No. 20-cr-2018-CJW<br><br><br>**REPORT AND RECOMMENDATION<br>ON DEFENDANT'S MOTION TO<br>SUPPRESS** |

_____

**TABLE OF CONTENTS**

Page

I.    *INTRODUCTION*................................................................2

II.   *FINDINGS OF FACT*..........................................................3

III.  *DISCUSSION*.................................................................10

　　　 A.   *Whether Officers Unnecessarily Prolonged the Investigative Stop*.......10

　　　　　　 1.   *The Parties' Arguments*....................................................10

　　　　　　 2.   *Analysis*..................................................................11

　　　　　　　　　 a.   *Whether the Dog Sniff Unreasonably Extended the Duration
　　　　　　　　　　　  of the Traffic Stop*................................................18*

　　　　　　　　　 b.   *Whether Reasonable Suspicion Justified the Continued
　　　　　　　　　　　  Duration of the Traffic Stop to Investigate Unrelated
　　　　　　　　　　　  Criminal Activity*..................................................20*

1

**B.** **Whether the Search of Defendant's Residence Violated the Fourth Amendment** .................................................................**29**

      **1.** **The Affidavit in Support of the Warrant**...........................**29**

      **2.** **Relevant Law**..............................................................**35**

      **3.** **The Parties' Arguments**................................................**38**

      **4.** **Substantial evidence in the record supported issuance of the warrant**................................................................**38**

      **5.** **The Leon good faith exception applies to the warrant**.............**40**

      **6.** **Even when the evidence is redacted from the affidavit, substantial evidence in the record still supports issuance of the warrant**.....**45**

**IV.** **CONCLUSION**...............................................................**51**

## I.     INTRODUCTION

On May 19, 2020, the Grand Jury charged Defendant with two counts of Possession of a Firearm by a Drug User in violation of 18 U.S.C. Section 922(g)(3) and one count of False Statement During Purchase of a Firearm in violation of 18 U.S.C. Section 924(a)(1)(A).  (Doc. 2.)  The charges arose from a traffic stop and an open-air canine sniff of Defendant's vehicle that occurred on March 15, 2019.

The matter before the Court is Defendant's Motion to Suppress Traffic Stop and Subsequent Evidence.  (Doc. 23.)  The Government timely filed a resistance.  (Doc. 25.) The Honorable Charles J. Williams, United States District Court Judge, referred this motion to me for a Report and Recommendation.

I held a hearing on Wednesday, August 5, 2020. (Doc. 26.) The Government called two witnesses: Officer Jordan Ehlers and Officer Matthew Woodward, both of the Waterloo Police Department.  Both officers are graduates of the Iowa Law Enforcement

2

Academy and have taken additional law enforcement training; have been police officers since 2012; and have been with the Waterloo Police Department since 2016 and 2014, respectively. Both officers are members of the Violent Crime Apprehension Team ("VCAT"), which investigates gun violence in the city of Waterloo. (Ehlers Hr'g Test.)[1] Government's Exhibits 1-9 were admitted without objection. Defendant called no witnesses and proffered no evidence. For the following reasons, I respectfully recommend that the District Court **deny** Defendant's Motion to Suppress Traffic Stop and Subsequent Evidence.

## II.    FINDINGS OF FACT

Just after midnight on March 15, 2019 ("March 15"), Officers Ehlers and Woodward were patrolling the 500 block of Broadway Street in Waterloo, Iowa in their police vehicle. (Ehlers & Woodward Hr'g Test.) Officer Ehlers was driving below the 35-miles-per-hour speed limit. He identified the area as a "high crime" block. According to Officer Woodward, "A lot of our shootings and large fights, disorderlies, occur in that 500 block, particularly the 508 Broadway, which is the Prime Mart." (Woodward Hr'g Test.) Officer Woodward testified that Prime Mart Liquor is a "hot spot" for crime: "weapons violations and disorderlies. . . . simple shoplifting to fights to felon possession, a lot of gun cases, a lot of dope cases ranging from simple possession to gun charges. . . . Pretty much everything happens there." (*Id.*) Officer Ehlers testified that officers report the odor of marijuana emanates from the store.

Although neither officer recalls if they were going north or south on Broadway Street, both officers testified that at approximately 12:30 a.m., they observed two vehicles stopped next to each other in the Prime Mart parking lot. (Ehlers & Woodward

---

[1] Citations to hearing testimony and oral argument are to the Court Reporter's rough draft of the transcript of the August 5, 2020 suppression hearing that was provided as a courtesy to the Court. An official transcript of the hearing had not been entered into the docket at the time this Report and Recommendation was filed.

3

Hr'g Test.) Neither officer can recall exactly where the cars were parked. One of the vehicles was a Chevrolet Malibu that was later determined to be Defendant's. Someone exited the back seat of another vehicle and approached the driver's side of the Malibu and then returned to the other vehicle. The entire series of events took a few seconds. (Woodward Hr'g Test.) Neither officer could see what, if anything transpired at the side of the Malibu because the person who approached the Malibu was obstructing their view. However, in both officers' training and experience, such quick interactions are consistent with drug activity. (Ehlers & Woodward Hr'g Test.) Officer Ehlers testified that this type of activity has led to multiple drug seizures and arrests.[2]

When this interaction was over, Officers Ehlers and Woodward drove around the block, came back to the same area of the 500 block of Broadway, and saw the Malibu pull out of the parking lot. The officers do not know if any other similar interactions or further interaction with the person in the Malibu occurred. (Woodward Hr'g Test.) The officers followed the Malibu. While they were following the Malibu, Officer Woodward ran the vehicle's plates and discovered the vehicle belonged to Defendant. (Ehlers & Woodward Hr'g Test.)

Both officers were familiar with Defendant. Officer Ehlers knew Defendant from a 2017 shooting incident because he was assigned to locate Defendant when a warrant was issued for his arrest. (Ehlers Hr'g Test.) In conjunction with the investigation of that case, Officer Ehlers also reviewed reports of an executed search warrant and saw that multiple clear plastic baggies containing white residue consistent with cocaine and a small amount of marijuana had been located in Defendant's residence. (*Id.*) Officer Woodward was dispatched to the scene of the 2017 shooting and assisted in the search of Defendant's residence in conjunction with the investigation into the shooting.

---

[2] Officer Woodward testified that the officers never determined whether a drug transaction involving the Malibu ever occurred.

(Woodward Hr'g Test.) That search yielded marijuana and cocaine. (*Id.*) Officer Woodward also knew that Defendant had once been a member of the Cream Team, a criminal group, which is what the Waterloo Police Department calls gangs. The Cream Team was no longer active in 2019, having disbanded before 2016. (*Id.*) When the group was active, its criminal activities included possession of illegal narcotics, selling illegal narcotics, and "weapon-related violations." (*Id.*)

The officers followed Defendant less than a quarter-of-a-mile before they noticed Defendant's third brake light, the one in the center of the rear window, was not operational. (Ehlers & Woodard Hr'g Test.) Officer Woodward once had the same Malibu as Defendant and knew the car was equipped with a third brake light. (Woodward Hr'g Test.) The officers conducted a traffic stop because driving with a missing or inoperable third tail light was a violation of Iowa Code Section 321.387.[3] Officer Ehlers approached the driver's side window of the vehicle. Defendant had his driver's license and permit to carry a concealed weapon ready to present to the officer. Upon seeing the permit to carry, Officer Ehlers asked if Defendant had "it" on him. (Gov. Ex. 3 at 00:14.) Defendant responded, "A yeah, I got [inaudible]. It's, a, right here," picked a handgun up from the passenger seat, and placed it on the dashboard. (*Id.* at 00:17; Ehlers & Woodard Hr'g Test.) Officer Woodward approached the vehicle on the passenger side and arrived at the front passenger-side window just as Officer Ehlers asked, "Do you have it on you?" As soon as Officer Woodward got to the side of the Malibu, he saw Defendant pick up the gun, and said to Defendant, "Put it down, put it down." (Gov. Ex. 4 at 0:35; Woodward Hr'g Test.) Although it is normal practice in a traffic stop to ask for license, registration, and proof of insurance (Ehlers & Woodard Hr'g Test.),

---

[3] In relevant part, the statute provides that "[a]ll lamps and lighting equipment originally manufactured on a motor vehicle shall be kept in working condition or shall be replaced with equivalent equipment." Iowa Code § 321.387.

5

Officer Ehlers did not initially ask for proof of insurance or registration when he approached the vehicle.

Defendant requested to see the brake light that was out. When Defendant exited the Malibu and walked to the rear of the vehicle, Officer Ehlers leaned into the vehicle and put his foot on the brake pedal so Defendant could see the light was not working. Officer Ehlers did not smell marijuana when he leaned into the vehicle. Officer Ehlers then returned to the squad car while Defendant waited outside at the rear of the vehicle with Officer Woodward.[4]

In the squad car, Officer Ehlers radioed Dispatch a request for a driver's license and warrant check on Defendant. (Gov. Ex. 3 at 2:34; Ehlers Hr'g Test.) Officer Ehlers then accessed a program called Shieldware, which allowed him to obtain Defendant's criminal history for the Waterloo and Blackhawk County area. Officer Ehlers also called Dispatch and requested a check of Defendant's weapons permit. These checks are "the type of activities" Officer Ehlers does at every traffic stop. (Ehlers Hr'g Test.) Dispatch responded that Defendant had a valid driver's license, a valid weapons permit, and no warrants. Officer Ehlers then requested that Dispatch run a "Triple I" on Defendant. Officer Ehlers's familiarity with the 2017 shooting incident made him "extremely concerned" there had been an error regarding the validity of Defendant's weapons permit because being convicted of a felony would invalidate a weapons permit.[5] (Ehlers Hr'g Test.) A Triple I is a nation-wide FBI criminal history report showing a person's criminal convictions and dismissals. Officer Ehlers described the Triple I as "ultimately, a rap

---

[4] After Officer Ehlers returned to the squad car, Officer Lucas Scarbrough arrived and remained on the scene for the duration of the officers' encounter with Defendant.

[5] "No professional or nonprofessional permit to carry weapons shall be issued to a person who . . . . [i]s subject to the provisions of section 724.26." Iowa Code § 724.8(4). Iowa Code Section 724.26 provides, in pertinent part, that "[a] person who is convicted of a felony in a state or federal court . . . is guilty of a class 'D' felony." Iowa Code § 724.26(1).

sheet." (*Id.*)  Although the impetus for requesting the Triple I was a local shooting, "the only way to check for an actual felony conviction is on the Triple I." (*Id.*)  The request for the Triple I took 18 seconds.  (Gov. Ex. 3 at 5:12-5:30.)  In the meantime, Officer Ehlers once again checked Shieldware because that database sometimes shows dismissals and convictions and sometimes does not.  Officer Ehlers found "multiple prior convictions for . . . possession of marijuana" in Defendant's criminal history.[6] (Ehlers Hr'g Test.)  He also attempted to check Iowa Courts Online, which allows a person to check someone's criminal history in the state of Iowa, including both convictions and dismissals, to ascertain the disposition of Defendant's 2017 shooting charge.  However, the site would not properly load for Officer Ehlers.[7] (*Id.*; Gov. Ex. 3 at 6:45.)  Checking a driver's criminal history is normal procedure during a traffic stop.  (Ehlers Hr'g Test.)  Requesting a Triple I check is not.  (*Id.*) Dispatch never returned the results of the Triple I check.

After reviewing Defendant's criminal history, Officer Ehlers left the squad car and asked Defendant about the prior convictions, which he admitted.  He asked about the 2017 charges and Defendant said he had been acquitted of those charges, which was true.  Defendant asked if he was being detained and said if not, he would like to leave.  (Gov. Ex. 3 at 9:20.)  Officer Ehlers said Defendant was not free to go because they were not done with the traffic stop.  (*Id.* at 9:54.)  Defendant asked, "What did I do to give you guys . . .", and Officer Ehlers responded, "Well, like I was just explaining. You're in a fairly high drug crime area. You have prior drug convictions, okay, alright. I'm not trying to be a dick. You're the one that's escalating this." (*Id.* at 10:02-10:17).  Defendant

---

[6] Defendant's convictions were for possession of marijuana on November 11, 2011 and November 1, 2012. In addition, Defendant had a deferred judgment for possession of marijuana on April 19, 2011.  (Doc. 25-2 at 10 ¶ 11.)

[7] Even had Officer Ehlers been able to access Iowa Courts Online, information from that site indicating a felony conviction cannot be used in court.  (Ehlers Hr'g Test.)

7

wanted to know the probable cause for further detaining him. (*Id.* at 10:19.) Officer Ehlers said Defendant was detained pursuant to a traffic stop. (*Id.* at 10:21-29.) Officer Ehlers asked if Defendant had insurance. Defendant replied that he had "full coverage insurance," but that he could look in the car for proof in the car or would have to call his mother for proof. (*Id.* at 10:36-11:05.) The officers did not allow Defendant to do so because they felt Defendant was becoming "agitated," his phone was in the vehicle, and, for officer safety and Defendant's safety, they did not want Defendant to go into the vehicle where the gun was on the dashboard. (*Id.* at 10:32, 11:14.) Officer Ehlers testified that it is normal in these situations for the driver to allow officers to check the glove compartment for proof of insurance or if there is no proof of insurance provided on the traffic stop, officers impound the vehicle and wait for a tow truck. Officers asked if they could check the car for proof of insurance or get Defendant his phone, and Defendant refused to allow officers access to the vehicle. (Gov. Ex. 3 at 10:48; Gov. Ex. 4 at 11:04; Woodward Hr'g Test.)

During the time that Officer Ehlers was checking Defendant's information in the squad car, Defendant asked Officer Woodward if he needed his insurance and Office Woodward said, "We'll get that in a little bit." (Gov. Ex. 4 at 1:42.) Defendant also asked to get a lighter from inside his vehicle so he could smoke a cigarette. (*Id.* at 2:00, 4:19.) Officer Woodward told Defendant he could not access the vehicle because the gun was inside the vehicle. (*Id.* at 4:22.) Defendant said, "He was not going to do anything to have . . . officers whup his ass,"[8] expressed fear of being shot by the police,[9] and said that he had witnessed a friend get killed by police despite the fact that his friend had dropped his gun.[10]

---

[8] (Gov. Ex. 4 at 7:38.)
[9] (*Id.* at 7:45.)
[10] (*Id.* at 8:13.)

Officer Ehlers then returned to the squad car and got his drug dog, Axe.[11]  Officer Ehlers did not feel threatened by Defendant at the point he made the decision to deploy Axe.  (Ehlers Hr'g Test.)  Defendant was calm during his interactions with Officers Woodward and Scarbrough when Officer Ehlers was in the squad car checking Defendant's background.  (*Id.*)  Officer Ehlers ran Axe around the outside of the vehicle and conducted an open-air sniff of the car.  (Gov. Ex. 3 at 11:33-12:48.)  As Officer Ehlers was running Axe around the car, Defendant admitted to Officers Scarbrough and Woodward that there was a bag of weed in the car.  (Gov. Ex. 4 at 12:53; Woodward Hr'g Test.)  Axe indicated there were drugs in the vehicle.[12]  (Ehlers Hr'g Test.)  Once Officer Ehlers completed the dog sniff, Officer Woodward informed Officer Ehlers that Defendant admitted there was marijuana in the vehicle.  (Gov. Ex. 3 at 12:52.)  Officer Ehlers read Defendant his *Miranda* rights and informed Defendant he was not free to leave the scene.  (*Id.* 13:48.)  Defendant told the officers that the marijuana was in the front console of the vehicle; that it belonged to his girlfriend; that he did not just get it on Broadway, but had it for a couple of days; and that he did not even smoke.  (*Id.* at 14:12.)

A search of the vehicle yielded 1) a clear plastic bag containing suspected marijuana in the center console, 2) a clear plastic bag containing suspected marijuana in a coat pocket, 3) a cigarillo pack containing loose tobacco in a hollowed-out cigar in the center console, 4) a box of ammunition in the glove compartment, 5) a marijuana pipe in the driver's side door panel, and 6) the loaded gun from the dashboard.  (Ehlers Hr'g Test.; Doc. 25-1 at 3-4.)  All items were seized.

---

[11] (Doc. 25-1 at 3 (naming the dog).)

[12]Defendant proffers no argument related to the dog's training or Officer Ehlers's certification as a K-9 handler.

9

The officers never issued Defendant a warning for having an inoperable brake light or a citation for violation of Iowa Code Section 321.387. Although the officers could have had the Malibu towed and removed the license plates due to no proof of insurance, they left the vehicle parked on the side of the street.[13]

Officer Woodward transported Defendant to the Waterloo Police Station where Officer Woodward interviewed him. During his interview, Defendant admitted he had used marijuana "consistently" since the age of 13. (Woodward Hr'g Test.) Defendant consented to give a urine specimen, but stated that it would show ecstasy because he and his girlfriend had recently taken the drug. The specimen tested positive for marijuana metabolites. (Doc. 25-2 at 12 ¶ 20.) After his interview, no charges were filed and Defendant was allowed to leave the police station.

Other facts and testimony will be introduced when relevant to the following discussion.

### III. DISCUSSION

**A.** **Whether Officers Unnecessarily Prolonged the Investigative Stop**

**1.** **The Parties' Arguments**

Defendant argues that his seizure was unreasonably prolonged in violation of *Rodriguez v. United States*, 575 U.S. 348 (2015). Defendant asserts that the purpose of the traffic stop was fulfilled when Officer Ehlers received information necessary to complete the stop from Dispatch. However, at that point, Officer Ehlers initiated a new investigation into Defendant unrelated to the initial purpose of the traffic stop, which Defendant argues was not properly supported by reasonable suspicion. Defendant argues that without additional reasonable suspicion, the officers had to allow him to leave once

---

[13] The Officers never determined if Defendant had proper insurance.

the purpose of the stop was concluded. (Doc. 23-1 at 7 (citing *Rodriguez*, 575 U.S. at 353-54).)

The Government responds that the dog sniff did not unreasonably prolong the traffic stop beyond the time that would have been necessary to complete the tasks associated with the original traffic infraction. (Doc. 25 at 13.) Moreover, even if the dog sniff prolonged the stop beyond the time necessary to complete tasks "tied to the traffic stop," the Government argues that Officer Ehlers had reasonable suspicion of criminal activity, which justified the prolonged detention of Defendant. (*Id.* at 14.)

### 2.    *Analysis*

It is "well established that a traffic violation—however minor—creates probable cause to stop the driver of a vehicle." *United States v. Linkous*, 285 F.3d 716, 719 (8th Cir. 2002)(citations omitted). Under the Fourth Amendment, an investigative stop of an automobile is a seizure. *Whren v. United States*, 517 U.S. 806, 809-10 (1996). "A seizure for a traffic violation justifies a police investigation of that traffic violation." *Rodriguez*, 575 U.S. at 354. The constitutionally acceptable length of the seizure of the individual involved "is determined by the seizure's 'mission.'" *Id.* (citing *Illinois v. Caballes,* 543 U.S. 405, 407 (2005)). Stops may last no longer than necessary to allow officers to achieve their stated purpose. *Id.* (citations omitted); *United States v. Jones*, 269 F.3d 919, 925 (8th Cir. 2001)). "A seizure justified only by a police-observed traffic violation . . . 'becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission' of issuing a ticket for the violation." *Rodriguez*, 575 U.S. at 350-51 (quoting *Caballes*, 543 U.S. at 407) (brackets omitted)). Whether an officer has reasonable suspicion to expand the scope of a stop is determined by looking at "the totality of the circumstances, in light of the officer's experience." *United States v. Carrate*, 122 F.3d 666, 668 (8th Cir. 1997) (citations and quotation marks omitted).

11

During a traffic stop, an officer may check a driver's license and registration, ask his destination and purpose, and ask him to step out of the car. *Linkous,* 285 F.3d at 719. Moreover, during a traffic stop, an officer "may detain the offending motorist while the officer completes a number of routine but somewhat time-consuming tasks" including a check of the driver's criminal history. *United States v. Quintero-Felix*, 714 F.3d 563, 567 (8th Cir. 2013) (citation omitted); *Jones*, 269 F.3d at 924-25 (listing several tasks officers can legally perform on a traffic stop). While a vehicle is stopped, officers may extend inquiries into matters unrelated to the traffic stop, as long as doing so does not "measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).

What length of stop and investigation is necessary will vary based on the circumstances of each case. An officer may detain a driver as long as reasonably necessary to conduct these investigative activities and to issue a warning or citation. *Jones,* 269 F.3d at 925 (citing *United States v. Wood,* 106 F.3d 942, 945 (10th Cir. 1997)). If, at any time during a reasonable traffic stop, an officer "develops a reasonable, articulable suspicion that a vehicle is carrying contraband," the officer may expand his intrusion into issues unrelated to any traffic offense. *United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005) (quotations omitted). A dog sniff of the exterior of a vehicle during a lawful traffic stop does not violate the Fourth Amendment. *United States v. Rivera*, 570 F.3d 1009, 1012 (8th Cir. 2009) (citing *Illinois v. Caballes*, 543 U.S. 405, 409-10 (2005)). However, that sniff cannot unreasonably prolong the stop absent "the necessary reasonable suspicion to justify a further detention or unless the continued encounter is consensual." *United States v. Munoz*, 590 F.3d 916, 921 (8th Cir. 2010) (citations omitted).

The initial traffic stop was justified because Defendant had a missing tail light, which violated Iowa Code Section 321.387. I also find that the time Officer Ehlers spent

in the squad car checking for Defendant's criminal history did not unnecessarily prolong the traffic stop. Defendant did not challenge this issue in his original brief. However at the suppression hearing, Defendant made the following argument:

> That additional evidence regarding the marijuana itself was the result of an illegally prolonged stop. The officer at no point needed to do this Triple I background check. And in that time, him asking for that, he went ahead and decided, "Oh, I'm going to look up these other things too." But even then, he for some reason was only able to find these old marijuana possessions, but found nothing on a felony investigation that both of them say they have knowledge of, because had he digged a little deeper at that point into that particular issue, he would have seen that Mr. Bullock was actually acquitted of all charges.

(Def. Oral Arg.) This argument is without merit. *See United States v. Mayville*, 955 F.3d 825, 831 (10th Cir. 2020). Defendant argues that *Mayville*, cited by the Government, can be distinguished from the case at bar:

> [T]he 10th Circuit actually determined that an officer is permitted to run a criminal history background check as a safety precaution during a stop so long as that check does not unreasonably prolong the stop. That was not the case here.
>
> Officer Ehlers ran that check stating that he was not in fear for himself because Mr. Bullock was standing at the rear of his vehicle with the officers being calm. They're armed. He's not. Officer Ehlers was in the safety of the police vehicle keeping nice and toasty.

(Def. Oral Arg.)

Defendant misconstrues *Mayville*. In *Mayville*, a highway trooper stopped a vehicle for speeding at about 1:45 a.m. 955 F.3d at 827-28. As the trooper approached the vehicle, he observed the driver, the sole occupant of the vehicle, "hunched over . . . as if he was 'trying to stash something or hide something.'" *Id.* at 828. The trooper asked for the driver's license, registration, and proof of insurance, which the driver had

trouble locating.  *Id.* The driver was only able to provide his out-of-state driver's license. *Id.*  The trooper thought the driver seemed confused and unable to "multitask" like most drivers.  *Id.* He thought the driver was drowsy or that "something was wrong, something was up."  *Id.*  Due to these observations, he asked the driver multiple times if he was okay and asked the driver to accompany him to his patrol car "to chat while he filled out the paperwork for the stop."  *Id.* The driver declined the invitation to leave his vehicle. *Id.*  The trooper returned to his patrol car alone to begin the paperwork for the stop and initially asked Dispatch to run a records check on the driver, which consisted of a driver's license check and a warrants check.  *Id.*  He also asked Dispatch to run a Triple I check on the driver.  *Id.*  Before the results of the checks came back, he also requested a drug dog and continued to work on paperwork and tried to "figure out whose vehicle it was" because the driver provided no registration paperwork.  *Id.*  The drug dog arrived, conducted and open air sniff of the vehicle, and alerted to the odor of narcotics.  *Id.* About 30 seconds later, Dispatch responded with the results of the Triple I check, stating that the driver had a criminal record.  *Id.*  The entire stop from the trooper's initial contact until the dog's alert lasted nineteen minutes. *Id.*

The trooper testified at the suppression hearing that he ran a Triple I because his patrol car computer provided limited information, especially about out-of-state drivers. *Id.* at 832.  He also testified that he "developed concerns based on Defendant's apparent stashing of something under the driver's seat, Defendant's demeanor during their initial six-minute interaction, and Defendant's inability to provide registration paperwork for the vehicle."  *Id. Mayville* held:

> Although Trooper Tripodi could have executed the traffic stop without running the records check through dispatch, and instead relied exclusively on the information available on the computer in his patrol car, his actions did not violate Defendant's Fourth Amendment rights. As the Court has repeatedly admonished, the Fourth Amendment does not require officers to use the least intrusive or most efficient means conceivable to effectuate a

traffic stop. *United States v. Sharpe*, 470 U.S. 675, 687, 105 S. Ct. 1568, 84 L.Ed.2d 605 (1985) ("The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.").

*Id.* *Mayville* reasoned that "an officer is permitted to run a criminal-history check as a safety precaution during a traffic stop so long as the check does not unreasonably prolong the stop" and the court saw "no reason to apply a different rule simply because an officer elects to conduct a Triple I check through Dispatch rather than research a motorist's criminal history on the computer in his patrol car." *Id.* at 831 (citations omitted).

The trooper in *Mayville* clearly had concerns about the driver's sobriety and suspected that the driver was involved with illegal narcotics because he called for a drug dog. Courts recognize that the illegal drug business is a dangerous business. *United States v. Caro*, 597 F.3d 608, 624 (4th Cir. 2010) ("[I]llegal drugs have long and justifiably been associated with violence.") (citations omitted); *United States v. Ward,* 171 F.3d 188, 195 (4th Cir. 1999) ("Guns are tools of the drug trade.") (citations omitted). *See also, United States v. Moore*, 212 F.3d 441, 447 (8th Cir. 2000) ("[P]eople who are dealing in drugs frequently use dangerous weapons, or have possession of dangerous weapons, for the purposes of protecting their bounty.") (quoting *United States v. Betz,* 82 F.3d 205, 211 (8th Cir. 1996)); *United States v. Nash*, 929 F.2d 356, 359 (8th Cir. 1991) ("[G]uns are 'tools of the trade' for drug dealers.") (quoting *United States v. Koonce,* 884 F.2d 349, 354 n.8 (8th Cir. 1989)).

Likewise, the fact that Officer Ehlers was inside his squad car and Defendant was standing behind his vehicle with two other officers did not entirely mitigate safety concerns based on the questionable legitimacy of Defendant's weapons permit. Even though he was ultimately proved wrong, Officer Ehlers testified that he thought the information he initially received was incorrect based on his prior knowledge about Defendant's involvement with a shooting and Officer Ehlers's own knowledge about a

15

search of Defendant's home that yielded illegal narcotics. Moreover, it is difficult to fault the officers for attempting to obtain accurate information on Defendant's criminal background when they suspected he had been convicted of a shooting and they faced the task of obtaining Defendant's registration, insurance, and/or phone from inside a car with a gun.

Although he was not allowed to prolong the stop based on a "mere hunch or based on circumstances which 'describe a very large category of presumably innocent travelers,'" Officer Ehlers did not do so in this case. *See Jones*, 269 F.3d at 927 (quoting *Reid v. Georgia,* 448 U.S. 438, 441 (1980)). He had specific concerns based on his own experiences, not hearsay from other officers or things he heard on the street. Unlike the trooper in *Mayville*, who only suspected the driver was hiding something, Officer Ehlers saw Defendant's gun. If Defendant had been convicted of the 2017 shooting, then his gun permit was presumably invalid.[14] These are unusual facts owing, in part, I suspect, to Officer Ehlers's membership in VCAT. Importantly, while he was waiting for the results of the Triple I from Dispatch, Officer Ehlers was using his time to find out if Defendant was convicted of the 2017 shooting. Multitasking in this way shows that Officer Ehlers was not trying to prolong the stop. *See Mayville*, 955 F.3d at 832 n.2 (trooper continued with tasks related to mission of the stop while waiting for results of Triple I). Also, it is common for Officer Ehlers to check criminal histories on his traffic stops. Thus, by checking Defendant's criminal history, he was not prolonging this stop. *See Quintero-Felix*, 714 F.3d at 567 (during traffic stop, officer may "detain the offending motorist while the officer completes a number of routine but somewhat time-consuming tasks . . . . [including a] check of the vehicle's registration and the driver's license and criminal history.") (citation omitted). Defendant argued at the hearing that

---

[14] As will be discussed below, as Officer Ehlers suspected, Defendant's weapons permit was, indeed, invalid.

the "additional evidence regarding the marijuana itself was the result of an illegally prolonged stop and "the officer at no point needed to do this Triple I background check." (Def. Oral Arg.) However, it is important to note that Officer Ehlers obtained the conviction information from Shieldware, which is one of his in-squad computers. This information was not obtained from Triple I because Officer Ehlers never received the Triple I results. Furthermore, Officer Ehlers did not wait for the results of the Triple I to exit his squad car and continue with the stop.

Defendant also argues that Officer Ehlers should have "[dug] a little deeper at that point into that particular issue, [so] he would have seen that Mr. Bullock was actually acquitted of all [2017] charges." Defendant cannot have it both ways. It appears from Government's Exhibit 3 and Officer Ehlers's testimony that Officer Ehlers exhausted all his resources trying to "dig deeper" looking for the resolution of the 2017 charges. However, had Officer Ehlers waited for the results of the Triple I, or continued to attempt to load programs and databases that were freezing, the stop would have lasted longer, which is the gravamen of Defendant's entire motion. Officer Ehlers finally gave up and told Defendant at the scene he could find no information about the outcome of the charges.

Finally, to the extent Defendant argues that merely asking for the Triple I unreasonably prolonged the traffic stop, I do not agree. It took Officer Ehlers 18 seconds to request the Triple I, which was a *de minimus* delay. (Gov. Ex. 3 at 5:12-5:30.) And, as discussed above, Officer Ehlers articulated good reasons for requesting the Triple I. Moreover, he did not waste time while waiting for the results. Rather, he did exactly what Defendant asserts he should have done: he dug into the 2017 charges to find out how they were resolved. Therefore, to the extent a separate finding is necessary, I recommend the District Court find that asking for the Triple I did not unnecessarily prolong the traffic stop.

Therefore the two issues presented by this case are 1) whether the dog sniff unreasonably extended the duration of an otherwise legitimate traffic stop and, 2) in the alternative, whether reasonable suspicion justified the continued duration of the traffic stop to investigate unrelated criminal activity.

> Beyond determining whether to issue a traffic ticket, an officer's mission includes "ordinary inquiries incident to [the traffic] stop." *Caballes,* 543 U.S., at 408, 125 S. Ct. 834. Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. See *Delaware v. Prouse,* 440 U.S. 648, 658–660, 99 S. Ct. 1391, 59 L. Ed.2d 660 (1979). See also 4 W. LaFave, Search and Seizure § 9.3(c), pp. 507–517 (5th ed. 2012). These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly. See *Prouse,* 440 U.S., at 658–659, 99 S. Ct. 1391; LaFave, Search and Seizure § 9.3(c), at 516 (A "warrant check makes it possible to determine whether the apparent traffic violator is wanted for one or more previous traffic offenses.").

*Rodriguez*, 575 U.S. at 355.

### a. Whether the Dog Sniff Unreasonably Extended the Duration of the Traffic Stop

The stop was not prolonged unreasonably because an officer is permitted to run a driver's criminal history and obtain proof of insurance. *See Rodriguez*, 575 U.S. at 355 (insurance); *Quintero-Felix*, 714 F.3d at 567 (criminal history). Officer Ehlers was not able to determine to his satisfaction the outcome of Defendant's 2017 arrest when he was in the squad car and was never able to obtain proof of insurance. When he exited the squad car, Officer Ehlers asked Defendant about his 2017 arrest and about proof of insurance, which were both legitimate questions. Moreover, when Officer Ehlers decided to deploy Axe, Defendant had still not provided proof of insurance and a decision had not yet been made regarding whether Defendant would receive a citation or a verbal or

18

written warning for his nonoperating brake light. (Woodward Hr'g Test.) Until those issues were resolved, the "mission" of the stop was not completed.

The events of this traffic stop are somewhat unusual. It was unusual for Defendant to voluntarily leave his vehicle so he could see his broken brake light. Once Defendant was out of the vehicle, he could not simply hand officers his insurance information, something that he would normally have had the opportunity to do, assuming his firearm was secured. Moreover, Officer Ehlers testified that most people who are not in their vehicles allow officers to look in their glove compartments for proof of insurance. Defendant would not allow officers to do so, as was his right. Nevertheless, this circumstance extended the duration of the traffic stop as Defendant and officers discussed the insurance issue. The discussion of whether Defendant had insurance and whether he would be allowed to access his phone and/or his proof of insurance in the vehicle lasted almost one minute. (Gov. Ex. 3 at 10:30-11:20; Gov. Ex. 4 at 10:44 to 11:40.) Before this discussion was completed, or at least before the insurance issue was resolved by having an officer call Defendant's mother or by having officers find Defendant's proof of insurance some other way, Officer Ehlers decided to deploy Axe.

Although the video evidence is difficult to see and hear at this point, I conclude that the dog sniff took one minute and fifteen seconds. All of the following times are from Government's Exhibit 3. At 11:33 to 11:34, Officer Ehlers opened the squad car door to let Axe out. At 11:44 to 11:45, Officer Ehlers gave Axe his first command. At 12:48, Officer Ehlers put Axe back in the car. Between those times, Officer Ehlers gave Axe commands and praise as they conducted the open air sniff of Defendant's vehicle.

During the sniff, neither Officer Woodward nor Officer Scarbrough tried to resolve the insurance issue or began writing Defendant a citation or warning. (Woodward Hr'g Test.) Under the circumstances of this case, this did not contribute to lengthening the duration of the stop. Officer Woodward testified that Officer Ehlers was the lead

officer on this stop, which meant that Officer Ehlers was in charge of obtaining documents. Officer Woodward did not take it upon himself to follow up on the insurance verification because he saw this as Officer Ehlers's task during this stop. Even if Axe had not been deployed, Officer Ehlers would have had to resolve the insurance issue and then decide whether to issue a verbal or written warning or a written citation. If Defendant had been unable to provide proof of insurance, Officer Ehlers would have had to decide if he was going to issue a warning memorandum or citation to Defendant or take other action. *See* Iowa Code § 321.20B(4a). It is reasonable to conclude that these tasks would have taken longer than one minute and fifteen seconds.

Although the insurance and brake light issues were abandoned when evidence of drugs was discovered, that does not mean that the dog sniff extended the stop. *Rodriguez* reasoned that "[t]he critical question . . . is not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff 'prolongs'—*i.e.,* adds time to—'the stop.'" 575 U.S. at 357. This prevents officers from delaying issuing tickets as a pretextual justification for prolonging stops to deploy K-9 officers. As discussed above, that did not occur in this case. The time it took Axe to do his job was time that would have been easily consumed by Officer Ehlers to 1) issue whatever warning, citation, or other action related to the brake light, 2) finish tracking down Defendant's insurance and, in the absence of proof of insurance, 3) issue a warning memorandum or citation or take other action for lack of proof of insurance.

Accordingly, I recommend that the District Court find that the dog sniff did not extend the duration of the traffic stop.

> ### b. Whether Reasonable Suspicion Justified the Continued Duration of the Traffic Stop to Investigate Unrelated Criminal Activity

The Government argues that even if the District Court determines that the dog sniff extended the duration of the traffic stop beyond what was needed to complete the

mission of the stop, the extension was justified because officers had reasonable suspicion of "unrelated criminal activity that justified the continued detention of defendant." (Doc. 25 at 14.) Defendant responds that the officers did not have reasonable suspicion to conduct the dog sniff and that the signs of nervousness the officers relied on to justify the sniff were not signs of criminality. (Doc. 23-1 at 7.)

An officer may expand the scope of a traffic stop into issues unrelated to the stop any time the officer "develops a reasonable, articulable suspicion that a vehicle is carrying contraband." *Sanchez*, 417 F.3d at 975 (quotations omitted). "'The concept of reasonable suspicion is somewhat abstract,' but 'the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.'" *United States v. Sanchez*, 955 F.3d 669, 674–75 (8th Cir. 2020) (quoting *United States v. Arvizu,* 534 U.S. 266, 274 (2002)), *reh'g denied* May 29, 2020.

> To establish reasonable suspicion, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" further investigation. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). The concept of reasonable suspicion is "not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). Instead, when determining whether reasonable suspicion exists, we consider the totality of the circumstances. *United States v. Woods*, 747 F.3d 552, 556 (8th Cir. 2014).

*United States v. Woods*, 829 F.3d 675, 679 (8th Cir. 2016).

The Government presented evidence of reasonable and articulable facts, which taken together with rational inferences from those facts, reasonably warranted Officer Ehlers in suspecting there was, as he testified, "illegal activity afoot." Officer Ehlers decided to deploy Axe because he suspected Defendant was involved in illegal drug activity due to 1) the time of night; 2) the location where he observed Defendant prior to

the traffic stop; 3) the interaction prior to the traffic stop in a high crime area; 4) Defendant's prior convictions for possession of marijuana; 5) "the Defendant's signs and clues of nervousness throughout the traffic stop," including heavy breathing and the way Defendant placed his gun on the dash;[15] and 6) "the Defendant's reactions when [the officers] brought those prior convictions up." (Ehlers Hr'g Test.)

Although none of these facts, standing alone, would provide reasonable suspicion that would justify the sniff, "the determination as to reasonable suspicion must be based on the 'totality of the circumstances,' [therefore], courts may not view individual elements of suspicion in isolation." *Sanchez*, 955 F.3d at 675; *United States v. Collins*, 883 F.3d 1029, 1032 (8th Cir. 2018) (totality of the circumstances determination precludes a "divide-and-conquer analysis" that challenges "each individual factor in isolation") (quotation omitted), *reh'g & reh'g en banc denied*, April 17, 2018.

---

[15] On cross-examination, Officer Ehlers stated for the first time that Defendant "brandished" the gun before he put it on the dashboard. When questioned about his use of the term, Officer Ehlers stated that his definition of "brandishing" was "just showing the firearm," even though Defendant was responding to Officer Ehlers's instructions. My review of Officer Ehlers's body camera footage does not support a finding that Defendant brandished the gun. Officer Ehlers's body camera video does not show what occurred, but the following exchange took place between Officer Ehlers and Defendant:

| Ehlers: | You got it on you tonight? |
| Defendant: | Oh yeah, I got [inaudible]. It's, a, right here. |
| Ehlers: | Ah, yeah, you just set it right there. I gotcha. |

(Gov. Ex. 3 at 0:14-0:24.)

To "brandish" means to "to display all or part of the firearm, or otherwise make the presence of the firearm known to another person, *in order to intimidate* that person." *Dean v. United States*, 556 U.S. 568, 572 (2009) (citing 18 U.S.C. § 924(c)(4)) (emphasis in original); *United States v. Lee*, 451 F.3d 914, 917 (8th Cir. 2006), *cert. granted, judgment vacated on other grounds,* 552 U.S. 1090 (2008). Here, the entire conversation sounded calm and it seems as if Defendant merely placed the gun on the dashboard in compliance with Officer Ehlers's instructions and did not intend to intimidate Officer Ehlers. Officer Woodward testified that Defendant "set[]" the gun on the dashboard.

The facts arose out of a nighttime stop, which "go[es] to officer safety." *United States v. Roggeman,* 279 F.3d 574, 578 (8th Cir. 2002). The area in which the stop occurred was what Officer Ehlers called a "fairly high drug crime area." (Gov. Ex. 3 at 10:05.) Defendant was just seen parked at Prime Mart, a location that is known as a "hot spot" for drug and gun crimes in Waterloo. (Woodward Hr'g Test.) Defendant argues that calling a location a high crime area "is a tool that the police use to justify their actions. . . . [A]s [Officer Ehlers] testified, there is likely to be a higher police presence in this area. A higher police presence, yes, that will result in more arrests, which statistically make that area look more high crime." (Def. Oral Arg.)

Although a person's presence in a high crime location, alone, cannot support particularized suspicion of criminal activity, the characteristics of a location are relevant to determining whether circumstances are "sufficiently suspicious to warrant further investigation." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Though neither Officer Ehlers nor Officer Woodward actually saw Defendant participate in a drug transaction at Prime Mart, both testified that based on their training and experience, short interactions between people in cars are consistent with drug deals. *See United States v. Ortiz-Monroy*, 332 F.3d 525, 529 (8th Cir. 2003) (In forming a basis for suspicion, officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.") (quotation omitted).

In addition, neither Officer Ehlers nor Officer Woodward was hearing Defendant's name for the first time on this traffic stop. The officers knew the following from working on the 2017 shooting incident. Officer Woodward helped execute a search warrant at Defendant's home where marijuana and cocaine were found. Officer Ehlers reviewed the reports from that search and knew white residue consistent with cocaine and marijuana were located in Defendant's residence. Officer Woodward also knew that Defendant had

once been a member of the Cream Team, a criminal group whose activities included narcotics and firearms crimes. In addition, Officer Ehlers discovered during his computer searches that Defendant had a criminal history that involved prior drug convictions. Defendant emphasizes that these convictions were for misdemeanor possession and were eight-to-nine-years-old. If these prior convictions were the only support for probable cause, Defendant's argument would carry greater weight. These convictions, even if somewhat dated, along with the other facts known to the officers, gave the officers reasonable suspicion that further investigation was warranted. *See United States v. Preston*, 685 F.3d 685, 690 (8th Cir. 2012) (finding defendant's prior criminal history was one factor creating reasonable suspicion for pat down during traffic stop and stating, "[T]here is no bright-line test for determining when information is stale.") (quotation and brackets omitted). Moreover, as recently as 2017, illegal drugs were found in Defendant's home, which indicates that Defendant did not cease his illegal narcotics activity eight or nine years prior to the traffic stop.

Finally, Officer Ehlers testified, "Defendant's signs and clues of nervousness throughout the traffic stop," including heavy breathing and the way Defendant placed his gun on the dash, led him to believe Defendant was involved in illegal drug activity. Officer Woodward found it suspicious that Defendant picked up the gun because "nine times out of ten times," people tell officers they have a firearm or tell them the location of a firearm instead of reaching for the firearm "for [officer] safety and their safety." (Woodward Hr'g Test.)

Officer Ehlers testified that Defendant was breathing heavily throughout the stop and that he was trained to know that heavy breathing is a sign of nervousness. Officer Woodward also testified that he took Defendant's desire to smoke a cigarette as a sign of nervousness, but admitted on cross-examination that it could have been that Defendant had not had a cigarette for a while and wanted one. Defendant's heavy breathing, such

that it occurred on the night of March 15, does not show up very well on videos provided for the Court. However, Defendant does not challenge that he was breathing heavily that night. Officer Ehlers recognized that some people of larger stature, a category of persons that includes Defendant (Doc. 23-1 at 7), breathe heavily on a regular basis and that Defendant could have been nervous due to the history of police relations with people of color.[16] (Ehlers Hr'g Test.) Defendant's statements during the stop indicate that he was at least worried about the potential of police violence during the stop. By itself breathing heavily would not constitute reasonable suspicion. However, it is permissible to consider the heavy breathing in determining there was reasonable suspicion.

Officer Ehlers testified that "Defendant's reactions when we brought [the 2017] convictions up" made him suspicious. The conversation between the officers and Defendant definitely took a turn at this point and Defendant became more defensive. However, topics changed very quickly, and it is difficult to tell what, exactly, made Defendant nervous. Defendant made it clear that on April 17, 2018, he was acquitted of all charges related to the 2017 shooting. (Gov. Ex. 3 at 9:42-49.) The discussion of insurance coverage immediately followed and Defendant became upset when officers would not allow him to look for proof of insurance in his vehicle or get his phone out of his vehicle so he could call his mother. (*Id.* at 10:44-11:20.) Defendant told the officers they were "trying to ruin his life." (*Id.* at 11:14.) Defendant also made it very clear that he would not let officers into his vehicle to look for proof of insurance or to get his phone, something that could have aided efficient resolution of the traffic stop. Officer Woodward testified that most drivers allow officers access to their vehicles to get proof of insurance. Defendant's desire to keep officers out of his vehicle was more suspicious behavior that indicated to the officers the situation required further investigation. *See*

---

[16] Defendant also notes that he has asthma and uses an inhaler as needed, but does not assert that he was suffering from that condition on March 15, 2019. (Doc. 23-1 at 7.)

*Ortiz-Monroy*, 332 F.3d at 529 (officers may draw on their own experiences and training to make inferences about the situation that "might well elude an untrained person"). "[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Wardlow*, 528 U.S. at 124 (citing *United States v. Brignoni-Ponce,* 422 U.S. 873, 885 (1975); *Florida v. Rodriguez,* 469 U.S. 1, 6 (1984) (per curiam); *United States v. Sokolow,* 490 U.S. 1, 8-9 (1989)).

Defendant makes the valid point that he is a black man living in the present state of upheaval. Defendant argued that in the present climate of protests following the death of George Floyd and other black men, his nervousness could readily be explained merely by his interaction with police officers. I agree this could be a valid explanation for his apparent nervousness. The officers who testified also agreed. (Ehlers & Woodward Hr'g Test.) Even for trained officers, detecting a person's nervousness is to some extent subjective.

The officers point to some facts that support the conclusion, such as Defendant's heavy breathing and desire for a cigarette. As Defendant argues, these behaviors could also have innocent explanations: Defendant is a large man who breathes heavily and he may have just wanted a cigarette. Nervousness, by itself, is insufficient to support probable cause. *See United States v. Beck*, 140 F.3d 1129, 1139 (8th Cir. 1998) ("It certainly cannot be deemed unusual for a motorist to exhibit signs of nervousness when confronted by a law enforcement officer.") (citing *United States v. Wood*, 106 F.3d 942, 947 (10th Cir. 1997) ("It is certainly not uncommon for most citizens—whether innocent or guilty—to exhibit signs of nervousness when confronted by a law enforcement officer."); *United States v. Barron–Cabrera*, 119 F.3d 1454, 1461 (10th Cir. 1997) (holding that "[w]hile a person's nervous behavior may be relevant, we are wary of the objective suspicion supplied by generic claims that a Defendant was nervous or exhibited nervous behavior after being confronted by law enforcement officials. . . .")

(citation omitted)). On the other hand, law enforcement need not discount nervousness merely because there are possible innocent explanations for it. *See United States v. Cotton*, 782 F.3d 392, 396, 396 n.5 (8th Cir. 2015) (upholding *Terry* frisk because the "encounter occurred in a violent area, [defendant] reached for his waistband as the officers were approaching, and he had a nervous look on his face." The court specifically noted that nervousness is considered in the totality of the circumstances analysis.); *United States v. Simeon*, 115 F. Supp. 3d 981, 999 (N.D. Iowa 2015) (holding that innocent behavior, including nervousness, alone, "might be innocently explained," but that behaviors must be considered "as a whole in the light of the officers' 'experience and specialized training.'") (quoting *United States v. Ameling,* 328 F.3d 443, 448 (8th Cir. 2003) (noting quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). Here, Defendant's nervousness, even if innocently explained, could properly be considered in the officer's determination of reasonable suspicion.

Defendant argues that it appears that Officers Ehlers and Woodward never intended to conduct a routine traffic stop because Officer Ehlers did not initially ask for proof of insurance and because when Defendant offered his insurance to Officer Woodward, Officer Woodward said, "We'll get that in a little bit." I find no support for this argument. First, Defendant offered his license and weapons permit as soon as Officer Ehlers got to his window. (Gov. Ex. 3 at 0:13.) The exchange between Officer Ehlers and Defendant about whether Defendant had his gun with him and Defendant placing the gun on the dash immediately followed. (*Id.* at 0:13-0:24.) Officer Ehlers then explained that Defendant's third brake lamp was out. (*Id.* at 0:29-0:32.) Defendant asked to see the nonoperational brake light and left the vehicle to do so. (*Id.* at 0:34-51.) As I explained above, this diverted the stop from a more usual sequence of events. Therefore, it is understandable that Officer Ehlers's inquiry proceeded differently. After checking Defendant's records, Officer Ehlers asked if Defendant's 2017 case got "dropped." (*Id.*

at 9:43.)  The second thing he asked about was proof of insurance.  (*Id.* at 10:29.)  In the time between the two questions, Officer Ehlers explained to Defendant that he was still detained because the traffic stop was not yet completed.   Under the facts of this situation, this was not evidence of pretext to delay completion of the mission.   Once the discussion turned to proof of insurance, as discussed above, the officers gave Defendant multiple ways to supply that proof, short of allowing Defendant to access the vehicle himself.  Abandonment of the original mission of the traffic stop is not evidence that the mission was never legitimate in the first place.  *See United States v. Mendoza*, 677 F.3d 822, 826-28 (8th Cir. 2012) (dismissing defendant's argument that the Government failed to show what traffic laws he violated that led to traffic stop during which a drug dog alerted because officers' reports described defendant's conduct without citing the Iowa Code, therefore implying defendant did not receive a warning or citation for these violations).  Moreover, I found Officer Woodward credible when he testified that at that stop, he was letting Officer Ehlers take the lead on requesting documents from Defendant. He credibly testified that officers switch the lead role on calls based on who knows a person best or who has better rapport with a person.  (Woodward Hr'g Test.)  Second, even assuming Defendant's theory is correct, officers have probable cause to conduct traffic stops for minor traffic violations "even if a valid traffic stop is a pretext for other investigation." *United States v. Sallis*, 507 F.3d 646, 649 (8th Cir. 2007) (quoting *United States v. Coney,* 456 F.3d 850, 855-56 (8th Cir. 2006) (quoting *Linkous,* 285 F.3d at 719)); *see also Wren,* 517 U.S. at 813 (holding that an officer's subjective intentions for conducting a traffic stop "play no role in ordinary, probable-cause Fourth Amendment analysis").

Defendant bolsters his pretext argument by noting that after he was questioned at the Waterloo Police Station, he was released with no consequences other than forfeiture of the items seized during the search of his vehicle.  Defendant makes much of the fact

that he was allowed to keep is weapons permit.  The reasonableness of the expansion of the investigatory stop must be based on the totality of the circumstances at the time of the stop.  *See Linkous*, 285 F.3d at 720 ("An officer's suspicion of criminal activity may reasonably grow *over the course of a traffic stop* as the circumstances unfold and more suspicious facts are uncovered.") (emphasis added).  Thus, the fact that Officer Woodward allowed Defendant to keep his weapons permit *after* his custodial interview is not relevant to the analysis.

In conclusion, I recommend the District Court find that even if the dog sniff extended the duration of the traffic stop beyond what was needed to complete the mission of the stop, the extension of the stop was justified because officers had reasonable suspicion of unrelated criminal activity that justified the continued detention of Defendant.

**B.**    ***Whether the Search of Defendant's Residence Violated the Fourth Amendment***

   **1.**    ***The Affidavit in Support of the Warrant***

On July 10, 2019, ATF Task Force Officer Joseph Saunders obtained a search warrant for Defendant's home.[17]  (Doc. 25-2.)  In his affidavit in support of his application for the warrant, Officer Saunders stated from his training and experience he knew that pursuant to 18 U.S.C. Section 922(g)(3), it is illegal, in pertinent part, for anyone who is a user of, or addicted to, any controlled substance to possess any firearm or ammunition or to receive any firearm or ammunition that has been shipped or transported in interstate commerce.  (*Id.* at 7 ¶ 5.)  Officer Saunders believed Defendant had violated this statute and that probable cause existed to search Defendant's residence. Officer Saunders stated that the affidavit was "not intended to include every fact or detail

---

[17] At the time he applied for the warrant, Officer Saunders had been a Waterloo, Iowa police officer for over 22 years and was assigned as a task force officer with the ATF.  (Doc. 25-2 at 5.)  Defendant does not challenge Officer Saunders's qualifications.

observed by [him] or known to law enforcement. The information provided [was] based on [his] personal knowledge and observation, . . . information conveyed to [him] by other law enforcement officials, and [his] review of . . . evidence." (*Id.* at 6 ¶ 4.) The following information is either quoted or summarized in pertinent part from Officer Saunders's affidavit:

On March 27, 2017, Defendant's friend Regis Johnson was shot in the face at Defendant's former residence. (*Id.* at 7 ¶ 7.) Defendant brought Johnson to the hospital and officers interviewed him about the shooting. (*Id.*) Defendant did not admit to shooting Johnson, told several different stories about what occurred, and asked officers "hypothetically" if the shooting was an accident if the shooter would go to jail for manslaughter. (*Id.* at 7-8 ¶ 7.) Defendant also admitted to using marijuana, recently purchasing half-an-ounce of marijuana, and to selling marijuana on occasion at his residence and to previously selling cocaine. (*Id.* at 8 ¶7.) Defendant said he had been buying from the same dealer for years, but refused to provide the dealer's name. (*Id.*)

On April 12, 2017, investigators interviewed Johnson, who repeatedly said Defendant accidentally shot him. (*Id.* ¶ 8.) Johnson knew it was an accident because he and Defendant had been friends for about ten years. (*Id.*)

A search warrant was executed at Defendant's residence subsequent to the shooting and the following items were seized:

- A small piece of mostly-smoked browned rolled paper cigarette suspected to be marijuana;
- Several small clear plastic bags with the corners tied in a knot or cut off;
- A small clear plastic bag containing suspected narcotics—the narcotics were not sent to a lab for testing;
- A small piece of clear plastic with white residue; and
- A partially smoked/burnt brown rolled paper cigarette with suspected marijuana in it.

(*Id.* at 8-9 ¶ 9.)  Officer Saunders attested that he is familiar with the methods individuals "use to consume, package, and distribute illegal narcotics" and that the items listed above "are consistent with the use and sales of marijuana as described by BULLOCK during his March 2017 interview.  Specifically, the baggies with the corners torn off were consistent with packaging of drugs for resale, as placing street drugs into the corner of a plastic baggie and then tying and tearing off that corner is a common method of packaging street drugs for sale." (*Id.* at 9 ¶ 9.)

On July 6, 2018, Defendant applied for a permit to carry weapons through the Black Hawk County Sheriff's Office and answered "no" to the following question: "Are you an unlawful user of, or addicted to, any controlled substance?" (*Id.* at 9-10 ¶ 10.) In fact, Defendant had a deferred judgment for possession of marijuana from April 19, 2011 and convictions for possession of marijuana, second offense from November 11, 2011 and for possession of marijuana, third offense from November 1, 2012. (*Id.* at 10 ¶ 11.)

Officer Saunders's affidavit also contains a recitation of the events of March 15, 2019 discussed at length above. According to Officer Saunders, at approximately 12:32 a.m., a Waterloo VCAT K-9 Officer observed two cars next to each other at the Prime Mart Liquor located at 508 Broadway Street. (*Id.* ¶ 12.)

> A male subject exited the rear door of one of the vehicles (hereinafter referred to as "vehicle #1"). The male walked to the front driver's side door of the second vehicle (hereinafter referred to as "vehicle #2"). The VCAT Officer observed the male quickly get back into the back seat of vehicle #1. Prime Mart Liquor is known to be a high drug crime area. Based upon the officer's training and experience, he believed this type of activity was consistent with illegal drug activity

(*Id.* ¶ 13.)

Officer Saunders explained that the VCAT K-9[18] officer and another officer drove around the block, followed vehicle #2, noticed the vehicle's third brake lamp was "completely out," and initiated a traffic stop based on that violation. (*Id.* at 10-11 ¶¶ 14-15.) The driver "identified himself as BULLOCK. BULLOCK appeared to be breathing heavily, which is often an indication of nervousness. Law enforcement recognized BULLOCK as being the individual involved in the previously mentioned 2017 shooting." (*Id.* at 11 ¶ 15.) Bullock "retrieved a black handgun" from the passenger's side floorboard and "quickly plac[ed] it on the dash. BULLOCK was advised to just leave the handgun there." (*Id.* ¶ 16.)

"The VCAT K-9 Officer asked BULLOCK for consent to search the vehicle. BULLOCK refused. K-9 Axe was deployed at this time. Axe alerted on BULLOCK's vehicle. BULLOCK stated there was a bag of weed in his car." (*Id.* ¶ 17.) Bullock was *Mirandized*, stated he understood his rights, and admitted there was marijuana in the middle console of the car and that it had been there for a couple of days. (*Id.* ¶ 18.) During a search of the vehicle, officers found the following items:

- A clear plastic baggie containing suspected marijuana in the center console;
- Multiple packages of cigars in the center console. Two of the packages contained an amount of loose tobacco and one package still contained a cigar;
- A box of Winchester 9mm ammunition and other, loose 9mm ammunition inside the glove compartment;
- A glass pipe containing suspected marijuana residue in the driver's side door panel;
- A clear plastic bag containing an amount of loose marijuana inside a coat pocket on the back seat of the vehicle; and
- The firearm Bullock placed on the dash, that was identified as a SAR Arms 9mm semi-automatic handgun bearing serial number

---

[18] Officer Saunders identifies Officer Ehlers as both "the VCAT Officer" and "the VCAT K-9 Officer."

> Tll0215C05. Officers discovered the magazine contained 15 rounds of
> 9mm ammunition.

(*Id.* at 11-12 ¶¶ 18-19.)

After the search, Bullock was transported to the Waterloo Police Department, where he was interviewed by another VCAT Officer. (*Id.* at 12 ¶ 20.) Bullock reported smoking marijuana "every day consistently since age thirteen." (*Id.*) "BULLOCK consented to submitting a specimen of urine for testing purposes and indicated his urine may test positive for 'X' (a common term for ecstasy). BULLOCK's urine sample was tested by the Iowa Division of Criminal Investigation Laboratory, which determined it contained marijuana metabolites." (*Id.*)

Officer Saunders also described the following video evidence:

21. On June 6, 2019, VCAT Officers observed videos BULLOCK posted to open source social media on that day. In the first video, BULLOCK is depicted videoing himself and a young juvenile male behind him. They appear to be in a gun range. The juvenile male is shooting a black handgun. The video is captioned, "Teach em young." In a second video from the same date, BULLOCK filmed two juvenile males loading ammunition out of boxes into handgun magazines. At one point in the video, BULLOCK panned the camera to himself. The video is captioned, "Gun safety 101." In a third video, BULLOCK recorded a juvenile male shooting a black handgun at what appears to be a gun range.

22. On June 25, 2019, VCAT Officers observed an additional video BULLOCK posted that day to open source social media. In the video, BULLOCK is recording himself inside a vehicle. BULLOCK is singing and holding up a black handgun and points it at the camera. The handgun appeared to be the same handgun in all of the prior posts. BULLOCK waves the gun around.

23. On June 29, 2019, VCAT Officers observed another video BULLOCK posted to open source social media. In the video, BULLOCK appears to be

> smoking a marijuana blunt.[19] In each of these videos, it appears that
> BULLOCK is recording the video with a cell phone camera.

(*Id.* at 12-13 ¶¶ 21-23.) Officer Saunders attested that "during the month of June 2019, VCAT Officers observed multiple videos BULLOCK has posted to open source social media depicting him outside a residence," which officers identified as the target of the warrant. (*Id.* at 13 ¶ 24.) Law enforcement also confirmed with MidAmerican Utilities that Bullock holds the utilities for that address, that law enforcement observed Bullock on the front porch of the residence multiple days in June and July 2019, and that at approximately 7:30 a.m. on July 10, 2019, Officer Saunders drove by the residence and observed "BULLOCK'S vehicle, as well as his girlfriend's vehicle, parked outside the residence." (*Id.*) Officer Saunders further attested that based on his

> experience, and knowledge from others involved in narcotic investigations,
> I know that many people store their firearms in their homes, vehicles, or
> other locations over which they have dominion or control. Persons who
> possess firearms usually possess other items related to firearms, such as
> ammunition and ammunition magazines for their firearms, and financial
> records of their firearm transactions. I also know that individuals who use
> illegal controlled substances typically keep those controlled substances, as
> well as paraphernalia related to the use of controlled substances, in their
> homes, vehicles or other locations over which they have dominion or
> control.

(*Id.* at 14 ¶25.)

The items to be seized pursuant to the warrant included, in pertinent part, weapons, firearms, ammunition or explosives, and any records or documentation relating to the "transportation, ordering, purchase, possession of firearms, firearm parts, and

---

[19] Officer Ehlers testified that he knew Defendant was smoking a marijuana blunt based on his training and experience because the way Defendant was holding the object he was smoking was consistent with how one would hold a marijuana blunt and because "the appearance of the general blunt appear[ed] to be consistent with that of a rolled marijuana blunt."

ammunition" and related items. (*Id.* at 3 ¶¶ 2-6.)  The warrant also authorized seizure of any and all evidence related to the illicit "possession, use, dealing, manufacture, distribution, or dispensing in controlled substances" and "transportation, ordering, purchase, possession and/or distribution of controlled substances."  (*Id.* at 3-4 ¶¶ 7, 9.) The seizure of cellular phones and other communications devices was also authorized. (*Id.* at 3 ¶ 3.)

I granted the search warrant on July 10, 2019 and it was executed on July 11, 2019.  The following items were seized during the search:

- Optimo Cigarillos;
- Roach (burnt cigar);
- Green leafy substance (suspected marijuana);
- Green organic material (suspected marijuana);
- Green pills in cellophane;
- Glass pipe;
- Digital scale;
- (Indicia) band with (DeShaun BULLOCK);
- Taurus, TH9C, 9mm pistol (Serial number TLY35808);
- Black plastic pistol case for Taurus;
- 17 Rounds of Winchester ammunition in the magazine of the Taurus pistol;
- 25 Rounds of Winchester 9mm ammunition;
- 5-9mm Winchester casings and 1-9mm bullet;
- 1 Hornady 9mm round of ammunition;
- Sersilmaz pistol magazine;
- Iowa Firearm Permit (DeShaun BULLOCK Jr. DOB [  ], 1991); and
  White iPhone, Serial #DX3V955SCH601, Model # MNR22L/A (This iPhone released back to DeShaun BULLOCK, Jr.).

(Doc. 25-3 at 2-4.)

### 2.   *Relevant Law*

The Fourth Amendment to the United States Constitution provides that "no [search] Warrants shall issue, but upon probable cause, supported by Oath or affirmation,

and particularly describing the place to be searched, and the persons or things to be seized."

"Probable cause exists when, viewing the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Reed*, 921 F.3d 751, 757 (8th Cir. 2019) (quoting *Illinois v. Gates*, 462 U.S. 213, 230, 238 (1983)). "Common sense" drives the inquiry into whether probable cause exists, and the ultimate determination cannot be "readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 231-32 (1983). "'[T]his practical and common-sensical standard' is based on 'the totality of the circumstances.'" *United States v. Zamora-Garcia*, 831 F.3d 979, 983 (8th Cir. 2016) (alteration in original) (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)).

It is not this Court's place to determine whether affidavits supporting search warrants are supported by probable cause. "[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's determination of probable cause should be paid great deference by reviewing courts." *Gates*, 462 U.S. at 236 (citation and internal quotation marks omitted). "In reviewing the issuance of a warrant, a district court need not make a *de novo* inquiry into the existence of probable cause, but rather should uphold the decision to issue the warrant so long as it is supported by 'substantial evidence in the record.'" *United States v. Hallam*, 407 F.3d 942, 948 (8th Cir. 2005) (quoting *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984) (per curiam)); *see also United States v. Reivich*, 793 F.2d 957, 959 (8th Cir. 1986) ("[T]he decision to issue the warrant is to be upheld if supported by substantial evidence on the record."). "When a magistrate relies solely on an affidavit to issue the warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Farlee*, 757 F.3d 810, 819 (8th Cir. 2014) (citation and internal quotation marks omitted).

Therefore, "[r]eviewing courts must give substantial deference to the original determination of probable cause made by the judge who issued the warrant, and that determination will not be set aside unless the issuing judge lacked a substantial basis for concluding that probable cause existed." *United States v. Edmiston*, 46 F.3d 786, 788 (8th Cir. 1995) (citing *Gates*, 462 U.S. at 238–39).

A substantial basis only requires that the issuing judge "make a practical and common-sense" determination, based only on the circumstances set forth in the affidavit, that the totality of the circumstances point to "a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Kail*, 804 F.2d 441, 444 (8th Cir. 1986) (quoting *Gates*, 462 U.S. at 238). "[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue." *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000) (citing *United States v. Koelling*, 992 F.2d 817, 823 (8th Cir.1993)). "Judges may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a search warrant." *United States v. Keele*, 589 F.3d 940, 944 (8th Cir. 2009) (citations omitted). Defendant bears the burden of proving the warrants were issued without probable cause. *Carter v. United States*, 729 F.2d 935, 940 (8th Cir. 1984) (citing *United States v. Phillips*, 540 F.2d 319 (8th Cir. 1976)).

I signed the search warrant in this case. "Federal Courts across the United States have consistently held that a judge who issues a search warrant is not necessarily required to recuse him- or herself from later presiding over matters arising in a subsequent criminal case against an individual who was affected by the search warrant." *United States v. Mathis*, No. 18-cr-18(1) (DWF/LIB), 2018 WL 4473529, at *10 (D. Minn. July 17, 2018) (citing *United States v. Hanhardt*, 134 F. Supp. 2d 972, 976 (N.D. Ill. 2001) (noting that *Hanhardt* collected cases holding that a district court's orders entered during pre-indictment investigations do not necessarily warrant the court's later recusal)),

37

*R. & R. adopted*, 2018 WL 4062741, at *3 (D. Minn. Aug. 27, 2018)). In adopting the R. and R., the *Mathis* court found that the Magistrate Judge did not need to recuse himself from considering warrant challenges because there was no evidence that the judge was biased or prejudiced and the defendant did not present any evidence indicating bias. 2018 WL 4062741, at *3. The same situation exists here. No party has requested I recuse myself and no reason exists that I must do so.

### 3. The Parties' Arguments

Defendant argues that any evidence seized during the search of his residence is "fruit of the unlawful seizure and search" conducted on during the March 15 traffic stop and must be suppressed. (Doc. 23-1 at 9.) He also argues that "there is no evidence that there would have been an investigation into [him] without the unlawfully obtained evidence from the traffic stop." (*Id.*)

The Government responds first that the warrant was supported by probable cause because the March 2019 stop did not violate the Fourth Amendment. (Doc. 25 at 17.) Second, even if the Court finds that officers unreasonably prolonged the stop, the *Leon* good faith exception should apply. (*Id.* at 17-18.) Third, the Government asserts that even if the evidence cited by Defendant was fruit of a poisonous tree, the warrant still contains probable cause after the tainted information is redacted. (Gov. Oral Arg.)

### 4. Substantial evidence in the record supported issuance of the warrant.

Defendant does not assert that the warrant is invalid on its face, only that certain information must be stricken from the warrant, which would strip the warrant of probable cause. (Doc. 23-1 at 8-9.) I find that substantial evidence in the record supports the warrant as written.

The affidavit states that Officer Saunders knows that under 18 U.S.C. Section 922(g)(3), it is illegal for an unlawful user of a controlled substance to possess any firearm or ammunition that has been shipped or transported in interstate or foreign commerce.

(Doc. 25-2 at 7 ¶ 5.)  The affidavit contains the following substantial evidence that Defendant possessed ammunition and firearms as a user of controlled substances

Defendant accidentally shot Regis Johnson in the face in March 2017.  (*Id.* at 7-8 ¶¶ 7-8.)  At that time, Defendant admitted using and selling controlled substances.  (*Id.* at 8 ¶ 7.)  After the shooting, a search warrant executed at Defendant's residence yielded suspected marijuana and baggies cut and tied in a way consistent with the packaging of street drugs for sale.  (*Id.* at 8-9 ¶ 9.)  Defendant obtained his weapons permit under false pretenses in 2018.  (*Id.* at 9-10 ¶¶ 10-11.)  Prior to a March 2019 traffic stop, a VCAT officer witnessed activity involving Defendant's vehicle he believed was consistent with illegal drug activity at Prime Mart Liquor, which is located in a high drug crime area and followed Defendant's vehicle, executing a traffic stop for a nonoperational third brake lamp.  (*Id.* at 10-11 ¶¶ 13-15.)  Defendant had a gun with him, refused to consent to a search of the vehicle, and was breathing heavily, which is often a sign of nervousness.  (*Id.* at 11 ¶¶ 15-17.)  A drug dog alerted on Defendant's vehicle and Defendant admitted there was marijuana in the vehicle after being *Mirandized*.  (*Id.* ¶¶ 17-18.)  A search of the vehicle yielded marijuana, loose tobacco hidden in a cigar package, ammunition, and the gun with ammunition in the magazine.  (*Id.* ¶ 18.)  Defendant admitted to using marijuana every day "consistently" since he was 13-years-old and using ecstasy.  (*Id.* at 12 ¶ 20.)  His urine specimen tested positive for marijuana metabolites.  (*Id.*)  Videos Defendant posted in June 2019 showed him holding a firearm and "supervising" juveniles with the firearm.  (*Id.* at 12-13 ¶¶ 21-22.)  June 2019 video also showed Defendant smoking a marijuana blunt.  (*Id.* at 13 ¶ 23.)

The affidavit also established that individuals involved with firearms and illegal narcotics keep these items in places over which they have dominion and control and that the places to be searched were under Defendant's dominion and control.  (*Id.* at 13-14 ¶¶ 24-25.)  These facts provided a "a fair probability that contraband or evidence of a

39

crime [would] be found" at Defendant's residence. *Kail*, 804 F.2d at 444. They also provided a nexus between the contraband and the place to be searched. *Tellez*, 217 F.3d at 550. Not only had evidence of illegal narcotics been found at Defendant's residence in the past, narcotics and a firearm were seized from Defendant's car in March 2019. Moreover, Defendant posted videos of himself with both a firearm and marijuana in the month prior to when Officer Saunders swore out the affidavit on July 10, 2019, the last video being posted less-than-two-weeks before the affidavit was sworn. I recommend the District Court find that substantial evidence in the record supported issuance the warrant.

### 5. The Leon *good faith exception applies to the warrant.*

The Government argues that even if the Court finds the warrant lacked probable cause, the *United States v. Leon* good faith exception applies to the warrant. (Doc. 25 at 17-18.) Reviewing courts should not suppress evidence seized pursuant to a search warrant, even if the reviewing court determines probable cause was absent, if the officers applying for the search warrant acted in objectively reasonable reliance on the issuance of the warrant by a neutral magistrate. *United States v. Leon*, 468 U.S. 897, 922 (1984). Under this "good-faith exception," if a law enforcement officer's reliance on a warrant so issued was objectively reasonable, the evidence seized pursuant to the invalid warrant will not be suppressed. *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007).

> Courts have applied the *Leon* good faith exception when . . . the search warrant application cites information gathered in violation of the Fourth Amendment. *See, e.g.*, *United States v. Kiser*, 948 F.2d 418, 421-22 (8th Cir. 1991) (finding that the *Leon* good faith exception applied to the search warrant even if the officers lacked reasonable articulable suspicion to detain defendant long enough to conduct a dog sniff); *United States v. White*, 890 F.2d 1413, 1419 (8th Cir. 1989) ("[E]vidence seized pursuant to a warrant, even if in fact obtained in violation of the Fourth Amendment, is not subject to the exclusionary rule if an objectively reasonable officer could have believed the seizure valid."). For the *Leon* exception to apply when a

40

warrant is based on evidence obtained through a Fourth Amendment violation, the officers' prewarrant conduct must have been "close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable." *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997) (quoting *White*, 890 F.2d at 1419). If "the officers' prewarrant conduct is 'clearly illegal,' the good-faith exception does not apply." *Id.* (quoting *United States v. O'Neal*, 17 F.3d 239, 242-43 n.6 (8th Cir. 1994)).

*United States v. Zarate*, No. 18-CR-2073-CJW-MAR, 2019 WL 3459236, at *6 (N.D. Iowa July 31, 2019).

*Proell* recognized four scenarios where it is not objectively reasonable for the executing officer to rely on a warrant issued by a magistrate.[20] 485 F.3d at 431. Defendant does not proffer that any specific *Proell* exceptions apply in this case. However, Defendant argues that based on the reasoning of *United States v. O'Neil*, 17 F.3d 239 (8th Cir. 1994), cited in *Zarate*, above, and cited in the Government's brief, the good faith exception should not apply because the Government's conduct on March 15 was "clearly illegal" and the officers "knew what they were doing was wrong." (Def. Oral Arg.) I interpret Defendant's argument as an argument that the warrant was "so lacking in indicia of probable cause as to render official belief in its existence *entirely unreasonable*." *Proell*, 485 F.3d at 431.

---

[20]

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge 'wholly abandoned his judicial role' in issuing the warrant; (3) when the affidavit in support of the warrant is 'so lacking in indicia of probable cause as to render official belief in its existence *entirely unreasonable*'; and (4) when the warrant is 'so facially deficient' that no police officer could reasonably presume the warrant to be valid.

*Proell*, 485 F.3d at 431 (citing *Leon*, 468 U.S. at 923) (emphasis in original).

41

In relevant part, *O'Neal* held that prior to the seizure of a defendant's bag at a bus station, "[n]o officer could in good faith believe that the facts would lead a reasonable person to believe that [the defendant] was involved in criminal activity." 17 F.3d at 243 n.6. In *O'Neal*, the defendant and his brother arrived at the Greyhound Bus Terminal in Minneapolis from Chicago. *Id.* at 240. Officers approached the men, questioned them, seized the defendant's carry-on bag, and left the area with the bag. *Id.* They then asked the defendant if the bag contained drugs and the defendant admitted that it did. *Id.* A drug dog alerted on the bag, the defendant was arrested, officers obtained a warrant for the bag, and a search of the bag revealed cocaine. *Id.* The facts supporting the officers' reasonable articulable suspicion to search the bag were that the brothers arrived from Chicago, a "source city" for drugs; the defendant was a black male wearing a Chicago Bulls Starter jacket and the brothers were carrying Chicago Bulls "athletic-type" bags; the brothers walked "briskly" to the door of the terminal, rather than into the bus terminal; the defendant "stared" at one of the officers, who thought the defendant looked "apprehensive;" the brothers both lit cigarettes; the Defendant was "sweating profusely" and appeared nervous; and when officers asked to search the defendant's bag, he stated they would need a search warrant. *Id.* at 240-41. In addition, the defendant provided valid identification, although one of the officers did not think the photo looked like the defendant; his brother had the bus tickets for both men; and the brothers stated they were visiting their sister and gave her address, which checked out when verified. *Id.* *O'Neal* reasoned, "If clearly illegal police behavior can be sanitized by the issuance of a search warrant, then there will be no deterrence, and the protective aims of the exclusionary rule will be severely impaired if not eliminated." *Id.* at 243 n.6 (citing Craig M. Bradley, *The "Good Faith Exception" Cases: Reasonable Exercises in Futility*, 60 Ind. L. J. 287, 302 (1985) (quoted in 1 Wayne R. LaFave, *Search & Seizure* § 1.3(f) (2d ed. 1987)).

The four corners of the warrant do not document illegal police behavior that Officer Saunders was trying to sanitize by obtaining a search warrant. Unlike the *O'Neal* warrant, the warrant in the instant case does not document innocuous behavior that could be undertaken by law-abiding citizens. Law-abiding citizens do not obtain weapons permits under false pretenses, do not possess illegal narcotics and weapons they obtained using illegally-acquired weapons permits, do not admit to using marijuana "continually," and then go on to possess firearms in violation of federal statute.

In determining whether law enforcement's reliance on a warrant was "entirely unreasonable," "[t]he court must look at the objectively ascertainable question of whether a reasonably well trained officer would have known that the search was illegal despite a judge's issuance of the warrant." *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015) (citation omitted). *Leon* explained that "searches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." 468 U.S. at 922 (quotations omitted). Nevertheless, "in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Id.* at 922-23 (footnote omitted).

The good-faith exception routinely applies unless there are extreme circumstances which prevent its application. In *United States v. Herron*, for example, the good-faith exception did not apply because although there was no technical legal deficiency in the affidavits, there was "simply no evidence" in the affidavits linking the suspect to criminal activity. 215 F.3d 812, 814 (8th Cir. 2000).

*United States v. Johnson*, 332 F. Supp. 2d 35, 39 (D.D.C. 2004) is a good example of the basis for finding the good-faith exception does not apply. *Johnson* held the good-faith exception inapplicable where (1) the affiant failed to describe when information was obtained; (2) the affiant failed to corroborate a sponsoring witness's account of events;

(3) the affiant failed to obtain a statement from any witness as to the suspect's residence; (4) the information giving rise to the search was stale; and (5) the nexus to the location to be searched was never established. Officer Saunders's affidavit fails in none of these particulars.

*United States v. Hove*, 848 F.2d 137, 139–40 (9th Cir. 1988) found the good-faith exception inapplicable where "the affidavit offer[ed] no hint as to why the police wanted to search th[e] residence[,] . . . d[id] not link th[e] location to the defendant and . . . d[id] not offer an explanation of why the police believed they may find incriminating evidence there; the affidavit simply list[ed] the [suspect's] address as a location to be searched." Once again, Officer Saunders's affidavit cannot be criticized on any of these bases. *United States v. Gonzales*, 399 F.3d 1225, 1231 (10th Cir. 2005) found the good-faith exception could not apply because the affidavit "completely failed to explain why [the officer] believed the items sought would be found at [suspect's residence]." Again, Officer Saunders's affidavit is sufficient in this regard.

Although Defendant argues that the actions of the officers on March 15 were illegal, the information in the warrant related to that date does not document illegal action. It documents activity at Prime Liquor that was consistent with illegal drug activity and a stop for a traffic violation. As previously discussed, it makes no difference if the traffic stop was a pretext to conduct an investigation into an alleged drug sale if the traffic violation actually occurred. *See Sallis*, 507 F.3d at 649. During the stop, Defendant appeared nervous based on Officer Saunders's training and experience and he had a gun. A drug dog alerted on the vehicle and Defendant admitted there was marijuana in the vehicle. After Defendant was *Mirandized*, he again admitted there was marijuana in the vehicle and that it had been there for a couple of days. A search of the car yielded marijuana, Defendant's gun, and ammunition, among other things. During a subsequent interview, Defendant admitted smoking marijuana every day consistently since he was 13

and indicated that his voluntary urine specimen may test positive for ecstasy. The sample tested positive for marijuana metabolites.

I find that nothing about the recitation of the March 15 activities causes concern that "[n]o officer could in good faith believe that the facts would lead a reasonable person to believe that [the defendant] was involved in criminal activity." On the contrary, the facts related to March 15 and the entire warrant would lead an officer to believe Defendant was involved in criminal activity. Therefore, even if the District Court finds that substantial evidence in the record did not support issuance of the warrant, I recommend that it find that the *Leon* good faith exception applies to the warrant.

### 6.    *Even when the evidence is redacted from the affidavit, substantial evidence in the record still supports issuance of the warrant.*

Evidence acquired through a source independent of the taint of a constitutional violation is admissible. *Wong Sun v. United States*, 371 U.S. 471, 487-89 (1963). "A warrant obtained after an illegal search is not an independent source if either of the following are true: if the agents' decision to seek the warrant was prompted by what they had learned" as a result of the unconstitutional search, and if information obtained during that unconstitutional search was presented to the judge and affected the judge's decision to issue the warrant. *United States v. Swope*, 542 F.3d 609, 613 (8th Cir. 2008) (quoting *Murray v. United States*, 487 U.S. 533, 542 (1988)).

In other words, two questions "must be answered in the affirmative for the warrant to be an independent source: first, would the police have applied for the warrant had they not acquired the tainted information; and second, do the application affidavits support probable cause after the tainted information has been redacted from them." *Id.* at 613-14. If removing the tainted information from the warrant removes the basis for probable cause, anything seized in the search based on the warrant must be suppressed. However, if the warrant with the information redacted still contains probable cause, any search

based on the warrant was valid, barring other constitutional violations or deficiencies. *Id.* at 616-17 (finding application supported probable cause when reading the untainted portions of the warrant at issue).

Defendant argues that the affidavit was based "primarily on evidence obtained by [his] unlawful seizure" during the March 15 traffic stop. Specifically, Defendant asserts that the following statements in Officer Saunders's affidavit must be stricken: "[1] evidence including marijuana that was found in Bullock's vehicle, [2] statements made by Bullock during the unlawful seizure[,] and [3] all interactions with Bullock at the police station." (*Id.* at 8.) Defendant avers that "[b]ut-for the unlawfully obtained evidence, the remaining facts identified as probable cause would have been insufficient on their own to issue a warrant." (*Id.* at 8-9.) Defendant further argues that there is no evidence there would have been an investigation into him without the evidence obtained from the traffic stop and therefore, the entire warrant is fruit of the poisonous tree. (*Id.* at 9.)

The Government responds that nothing contained in the warrant was fruit of the poisonous tree, but assuming that it was, the only evidence that must be suppressed would be the evidence found in the search of the vehicle and the incriminating statements Defendant made at the scene and in his interview on March 15. (Gov. Oral Arg.)

I have already concluded that evidence acquired on the night of March 15 was not obtained in violation of Defendant's Fourth Amendment rights. Therefore, I find there is no poisonous tree to bear fruit. Moreover, I first find that Officer Saunders would have applied for the warrant even if he had not acquired the allegedly-tainted information. Defendant had been known to Officer Ehlers (described in the affidavit as "the VCAT K-9 Officer or "the VCAT Officer) and Officer Woodward (described in the affidavit as "another officer") since 2017. Officer Saunders relied on his personal knowledge, information conveyed to him by other members of law enforcement and by his review of

46

evidence. (Doc. 25-2 at 6 ¶ 4.) Clearly, some of this information was conveyed by either Officers Ehlers or Woodward or their reports. (Doc. 25-1.) I find that even without knowing the results of the March 15 search or Defendant's March 15 statements, Officer Saunders would have known Defendant had a history of involvement with illegal narcotics and firearms, that he obtained his weapons permit illegally, and that he recently posted videos showing himself with firearms and marijuana. These facts would have induced Officer Saunders to apply for the warrant.

Second, even if the District Court disagrees and finds that the March 15 search, seizure of evidence, and subsequent interview violated the Fourth Amendment, I find that the affidavit still supports probable cause after the tainted information has been redacted from it. Defendant argues that information related to the following must be redacted from the affidavit: "[1] evidence including marijuana that was found in Bullock's vehicle, [2] statements made by Bullock during the unlawful seizure[,] and [3] all interactions with Bullock at the police station." Although Defendant does not specifically mention the gun and ammunition found in his vehicle on March 15, I will assume he wishes to have information related to the gun and ammunition redacted because Defendant was carrying an illegal weapons permit at the time of the search. What remains in the affidavit follows:

Information about a March 27, 2017 shooting victim who stated that Defendant accidentally shot him. (Doc. 25-2 at 8 ¶8.) At that time, Defendant admitted to using marijuana, recently purchasing half-an-ounce of marijuana, and to selling marijuana on occasion at his residence and to previously selling cocaine. (*Id.* at ¶7.) Defendant said he had been buying from the same dealer for years, but refused to provide the dealer's name. (*Id.*)

A search warrant was executed at Defendant's residence subsequent to the shooting and the following items were seized:

47

- A small piece of mostly-smoked browned rolled paper cigarette suspected to be marijuana;
- Several small clear plastic bags with the corners tied in a knot or cut off;
- A small clear plastic bag containing suspected narcotics—the narcotics were not sent to a lab for testing;
- A small piece of clear plastic with white residue; and
- A partially smoked/burnt brown rolled paper cigarette with suspected marijuana in it.

(*Id.* at 8-9 ¶ 9.) Officer Saunders attested that he is familiar with the methods individuals "use to consume, package, and distribute illegal narcotics" and that the items listed above "are consistent with the use and sales of marijuana as described by BULLOCK during his March 2017 interview. Specifically, the baggies with the corners torn off were consistent with packaging of drugs for resale, as placing street drugs into the corner of a plastic baggie and then tying and tearing off that corner is a common method of packaging street drugs for sale." (*Id.* at 9 ¶ 9.)

On July 6, 2018, Defendant applied for a permit to carry weapons through the Black Hawk County Sheriff's Office and answered "no" to the following question: "Are you an unlawful user of, or addicted to, any controlled substance?" (*Id.* at 9-10 ¶ 10.) In fact, Defendant had a deferred judgment for possession of marijuana from April 19, 2011 and convictions for possession of marijuana, second offense from November 11, 2011 and for possession of marijuana, third offense from November 1, 2012. (*Id.* at 10 ¶ 11.) Certainly, this information is somewhat dated. Nevertheless, it supplies information regarding Defendant's familiarity with illegal drugs.

On March 15, 2019, at approximately 12:32 a.m., a Waterloo VCAT K-9 Officer observed two cars next to each other at the Prime Mart Liquor located at 508 Broadway Street. (*Id.* ¶ 12.)

A male subject exited the rear door of one of the vehicles (hereinafter referred to as "vehicle #1"). The male walked to the front driver's side

48

> door of the second vehicle (hereinafter referred to as "vehicle #2"). The
> VCAT Officer observed the male quickly get back into the back seat of
> vehicle #1. Prime Mart Liquor is known to be a high drug crime area.
> Based upon the officer's training and experience, he believed this type of
> activity was consistent with illegal drug activity

(*Id.* ¶ 13.)    Defendant makes no argument that any evidence up until this point should be excluded from the warrant and I find there is no reason to redact any of this evidence for the purpose of this analysis.

Officer Saunders explained that the VCAT K-9 officer and another officer drove around the block, followed vehicle #2, noticed the vehicle's third brake lamp was "completely out," and initiated a traffic stop based on that violation.  (*Id.* at 10-11 ¶¶ 14-15.)  The driver "identified himself as BULLOCK. BULLOCK appeared to be breathing heavily, which is often an indication of nervousness. Law enforcement recognized BULLOCK as being the individual involved in the previously mentioned 2017 shooting." (*Id.* at 11 ¶ 15.)   Bullock "retrieved a black handgun" from the passenger's side floorboard and "quickly plac[ed] it on the dash. BULLOCK was advised to just leave the handgun there." (*Id.* ¶ 16.)

"The VCAT K-9 Officer asked BULLOCK for consent to search the vehicle. BULLOCK refused. K-9 Axe was deployed at this time. Axe alerted on BULLOCK's vehicle." (*Id.* ¶ 17.)

Officer Saunders also described the following video evidence:

> 21. On June 6, 2019, VCAT Officers observed videos BULLOCK posted
> to open source social media on that day. In the first video, BULLOCK is
> depicted videoing himself and a young juvenile male behind him. They
> appear to be in a gun range. The juvenile male is shooting a black handgun.
> The video is captioned, "Teach em young." In a second video from the
> same date, BULLOCK filmed two juvenile males loading ammunition out
> of boxes into handgun magazines. At one point in the video, BULLOCK
> panned the camera to himself. The video is captioned, "Gun safety 101."

In a third video, BULLOCK recorded a juvenile male shooting a black handgun at what appears to be a gun range.

22. On June 25, 2019, VCAT Officers observed an additional video BULLOCK posted that day to open source social media. In the video, BULLOCK is recording himself inside a vehicle. BULLOCK is singing and holding up a black handgun and points it at the camera. The handgun appeared to be the same handgun in all of the prior posts. BULLOCK waves the gun around.

23. On June 29, 2019, VCAT Officers observed another video BULLOCK posted to open source social media. In the video, BULLOCK appears to be smoking a marijuana blunt. In each of these videos, it appears that BULLOCK is recording the video with a cell phone camera.

(*Id.* at 12-13 ¶¶ 21-23.)

I will assume Defendant wants all evidence associated with possible drug activity from the traffic stop redacted from the affidavit, including that Axe was deployed. Even reading Defendant's brief as seeking to redact all evidence beginning Axe's deployment, the redacted affidavit still establishes that Defendant has a long history of involvement with weapons and controlled substances. More importantly, the affidavit establishes that Defendant possessed a firearm and used marijuana as recently as the previous month. It also establishes that Defendant's 2018 weapons permit was obtained illegally, which allows for the logical inference that neither the firearm present at the March 15 traffic stop nor the firearm that can be seen in the June 2019 videos were purchased legally. Although Officers Woodward and Ehlers did not confirm that a drug sale occurred at Prime Liquor on March 15, the short term contact between the people in the vehicles is one piece of evidence that can be considered as part of the totality of the circumstances, which include Defendant's 2017 admission that he sold controlled substances in the past. Most important, the redacted affidavit still shows that Defendant, by his own admission to law enforcement in 2017 and on video in 2019, was a user of controlled substances

and possessed firearms, which satisfied the major elements of 18 U.S.C. Section 922(g)(3). Accordingly, I recommend that the District Court find that even if the affidavit is redacted, substantial evidence in the record still supports issuance the warrant.

## IV. CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **DENY** Defendant's Motion to Suppress Traffic Stop and Subsequent Evidence. **(Doc. 23.)**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the District Court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 21st day of August, 2020.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa

51